**SIGNED THIS: March 1, 2021**

_____
**Thomas L. Perkins
United States Chief Bankruptcy Judge**

_____

**UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE: | ) |
| LUCILLE J. JACKSON, | ) Case No. 19-80915 |
| Debtor. | ) |
| | ) |
| JOHN E. WILLIAMS, Jr., not personally But as Executor of the ESTATE of JOHN E. WILLIAMS, Sr., | ) |
| Plaintiff, | ) |
| vs. | ) Adv. No. 19-8073 |
| LUCILLE J. JACKSON, | ) |
| Defendant. | ) |

**OPINION**

This matter is before the Court after trial on the Complaint filed by the Plaintiff, John E. Williams, Jr., as Executor of the estate of his father, John E. Williams Sr., against Lucille Jackson, the Defendant, seeking a determination of nondischargeability pursuant to sections 523(a)(2)(A), (a)(4) and (a)(6) of the Bankruptcy Code. The debts in question are evidenced by

two orders issued by the state probate court. The primary issue is whether any collateral estoppel effect should be accorded to either or both of those orders.

**Factual Background**

Lucille Jackson, the Debtor, filed a Chapter 7 petition on June 26, 2019. On her bankruptcy schedules, the Debtor listed 1017 N.E. Glendale Avenue in Peoria as her residence, solely owned by her, indicating that she had lived there for the past three years. The Debtor also disclosed ownership of a one-fourth interest in a single-family home located in Greenville, Mississippi, valuing that interest at $2,500.  For many years and until his death on July 25, 2016, the Debtor was married to John E. Williams, Sr. (the Decedent).  A probate estate was opened in the Circuit Court for Peoria County, Illinois and John E. Williams, Jr., one of the Decedent's sons, was appointed Executor (Executor).  At some point in the proceedings, the Debtor filed a claim against the estate.  An order was entered on January 11, 2019, on the Executor's motion to dismiss the claim filed by the Debtor as untimely and for sanctions against her, denying the claim and awarding the Decedent's estate a judgment against the Debtor in the total amount of $2,695, representing costs of $195 and attorney fees of $2,500, characterizing her conduct in prosecuting her claim as, among other things, willful and malicious. A second order was entered on April 12, 2019, on the Executor's amended petition for citation to recover assets, directing the Debtor to pay the Estate $15,190 within fourteen days, to deliver a 1956 Buick and its title and to return all personal property that belonged to the Decedent. The second order makes no finding of willful or malicious conduct or other characterization of the Debtor or her conduct.

In the adversary complaint filed by the Executor, brought by him "not personally but as executor of the estate of John E. Williams, Sr.," he seeks a determination of nondischargeability of the obligations imposed against the Debtor by the probate court. A trial was held on December 1, 2020.  Three witnesses, including both the Debtor and the Executor, testified at trial. At the close of the evidence, the Executor withdrew Count II of the Complaint brought under section 523(a)(4).  The Debtor testified that she was not aware of the probate proceedings until some point well after the estate was opened and that she did not become aware that the Decedent's son, John Jr., had been appointed Executor until later.  She testified that she was represented by multiple attorneys in the probate proceedings.  The Debtor explained that the administration of the probate estate was protracted. The initial focus of the matter was the marital status of the

2

Decedent and the Debtor. The first attorneys representing the Debtor filed a claim on her behalf. She was advised by her second attorney that her claim was not time-barred. That attorney withdrew a short time later.

The Decedent was ill for a period of time prior to his death. Pursuant to a Power of Attorney he had executed, the Debtor was authorized to act as his attorney-in-fact. According to the Debtor's testimony, she and the Decedent owned rental properties prior to his death. Presumably due to his declining health, the Decedent had told her to collect the rents from the tenants, which she did both before and, for a period of time, after his death. The Debtor testified that when a tenant of one of the properties told her that the Executor had approached him to collect the rent, she advised the tenant to pay the rent to the Executor, explaining that she was not going to argue about it. Signed receipts admitted into evidence indicate that the Debtor collected monthly rent from one tenant, Mr. Brown, from August 2016 through January 2018. Nothing in the record speaks to why she ceased collecting the rent at that point in time.

Prior to his death, the Decedent and the Executor were authorized signatories on a joint checking account at South Side Bank, and their names were printed together at the top of each check. Copies of six checks are part of the record, dated within one month prior to the Decedent's death, each one bearing the indorsement of John E. Williams, the Decedent, accompanied by the Debtor's initials, indicating that she actually signed his name to the checks. The largest of the six checks is a check payable to the Debtor in the amount of $9,000, that the Debtor testified was used to pay a contractor, Dave Polnitz, for repairs made to the bathroom of their home. The check is dated July 20, 2016 but was not paid until July 27, 2016, two days after the Decedent passed away. The Debtor testified that the check was written and signed, by her, in the Decedent's presence and at his direction. According to her testimony, the check was not deposited in her CEFCU account until after the Decedent's death, as she was busy caring for him. The $9,000 amount of the check is included in the $15,190 that the probate court ordered the Debtor to repay to the estate.

The Executor testified that the probate proceeding was commenced and that he was appointed as executor within a month or two of the Decedent's death. He testified that the Decedent owned three vacant lots and one rental house on George Street, that were administered through the probate estate. At some point after his appointment, the Executor contacted William

3

Brown, the tenant in the George Street property, to collect the rent, and was advised by Mr. Brown that the Debtor had already instructed him to pay the rent to her. The Executor did not speak specifically with the Debtor about the collection of the rent from Mr. Brown, and stated he acquiesced in her continued collection of it even though he didn't think she had the right to the rents, preferring to resolve the matter in the probate court. He told Mr. Brown to continue paying the rent payments to the Debtor but admonished him to keep receipts, which he did.

Notwithstanding that the issue of the marital status of the Decedent and the Debtor was disputed by the Executor in the probate proceeding, in his testimony at trial, the Executor conceded and acknowledged that the Decedent and the Debtor were married in 1978 and were husband and wife at the time of the Decedent's death. The Executor testified that prior to his death, the Decedent was residing at the Glendale Avenue property by himself. He testified that the Debtor was residing primarily in Mississippi in 2016, but would come to Peoria for the Christmas holidays, remaining for a couple of weeks before returning to Mississippi. The Executor stated that he would visit with the Decedent every other day during that year, denying that he observed work being done on the home but admitting that the Decedent had hired workers for home repairs. He denied knowing Dave Polnitz or that he recognized his name, admitting only that as his father had gotten older, he had maintenance and repair work done by others because he could no longer do it himself.

Dave Polnitz, testifying on behalf of the Debtor, testified that he had known the Decedent since his childhood, being friends with one of the Decedent's nephews who often stayed with the Decedent. He testified that at the Decedent's request, he had done considerable work on the George Street rental property approximately five years ago, in 2015. Several months after he completed that work, he became acquainted with the Debtor when she contacted him to work on repairing damages to the Glendale Avenue property caused by water infiltration into the house. At that time, in 2016, both the Decedent and the Debtor lived there together in apparent harmony, according to Mr. Polnitz. He regularly saw and spoke to the Decedent at the house. The Decedent never questioned the work being done or expressed any dissatisfaction. At all times Mr. Polnitz perceived that the Decedent was in agreement with having him perform the repair and remodeling work, although it was the Debtor who regularly paid him.

4

After Mr. Polnitz finished the first project, others followed. He was working at the house for a period of seven or eight months but never encountered the Executor there. Six invoices describing the work performed by Mr. Polnitz and the charges therefore were admitted into evidence. The first invoice is dated April 4, 2016 and the last is dated September 5, 2016. The total amount of the invoices is $59,100, including a $10,000 charge for a total upstairs bathroom remodel on the June 6, 2016 invoice, a $19,000 charge for a total kitchen remodel on the July 4, 2016 invoice, and a $23,000 charge on the September 5, 2016 invoice for a lower level basement remodel. The Executor did not dispute that Mr. Polnitz completed the work evidenced by the invoices. At the close of the evidence, the matter was taken under advisement.

**Analysis**

Exceptions to discharge are narrowly construed against the creditor and liberally in favor of the debtor so as to effectuate the "fresh start" policy of the Bankruptcy Code. *In re Morris*, 223 F.3d 548 (7th Cir. 2000). The purpose of the fresh start is to protect "honest but unfortunate" debtors. *Grogan v. Garner*, 498 U.S. 279, 287 (1991). The creditor carries the burden to prove each element of the exception to the dischargeability of its debt by a preponderance of the evidence. *Id.*

The Executor's complaint states three alternative grounds, in three counts, for nondischargeability under sections 523(a)(2)(A) for fraud, 523(a)(4) for fiduciary fraud and 523(a)(6) for willful and malicious injury. In argument at the close of the trial, the Executor orally moved to dismiss Count II under section 523(a)(4), which was granted. Relying on the orders entered by the probate court, the Executor contends that the doctrine of collateral estoppel (issue preclusion) provides the basis for a judgment in his favor on Counts I and III. At trial, the Executor did not ask the Court to apply either exception to discharge to the provision of the probate court's second order directing the Debtor to return to the estate physical possession of a vehicle and certain items of personal property, so this Opinion will focus only on the dischargeability of the monetary portion of the judgments. The Court will first address Count III, brought under section 523(a)(6).

**Section 523(a)(6)**

5

In the adversary complaint, the Executor alleges that the Debtor engaged in willful and malicious conduct in forging and cashing checks on the Decedent's account after his death; improperly collecting rents after his death; and converting vehicles and other personal property of the Decedent. Section 523(a)(6) excepts from discharge any debt for "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. §523(a)(6). In order to establish the nondischargeability of a debt under this provision, a creditor must prove the following three elements by a preponderance of the evidence (1) that the debtor intended to and caused an injury to the creditor's property interest; (2) that the debtor's actions were willful; and (3) that the debtor's actions were malicious. Under the Supreme Court's decision in *Kawaauhau v. Geiger*, 523 U.S. 57 (1998), "willful" is defined to mean conduct intended to cause harm, not merely intentional conduct that results in an injury that was not intended. The term "malicious" involves acting in conscious disregard of one's duties or without just cause or excuse. *Matter of Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994). In essence, a willful and malicious injury is one that the injurer inflicted knowing he was acting without legal justification and either desiring to inflict the injury or knowing it was highly likely to result from his act. *Jendusa-Nicolai v. Larsen*, 677 F.3d 320, 324 (7th Cir.2012).

Despite the Executor's representations at a pretrial hearing on April 28, 2020, that the judgments entered by the probate court were not clear enough to be binding under the doctrine of collateral estoppel and that he perceived the issues in the case to be "relatively open," he placed sole reliance on that doctrine in his argument at the close of the trial with respect to the section 523(a)(6) count. The Executor relies on the first order of the probate court, maintaining that it contains a specific finding of willful and malicious conduct by the Debtor, which is conclusively binding on this Court. The Plaintiff points out that the Debtor participated in the proceeding and was represented by counsel.

It is well-settled that the doctrine of collateral estoppel applies in proceedings under Section 523(a) of the Bankruptcy Code and may be invoked to preclude relitigation of one or more of the elements necessary to meet an exception to discharge under that provision. *Grogan v. Garner*, 498 U.S. 279, 285 at n. 11 (1991). The premise underlying the doctrine is that once an issue of fact has been fully litigated and decided in a prior proceeding, it is not unfair that the parties should be bound by and barred from relitigating that issue in a subsequent lawsuit

6

brought on a different cause of action but involving the same question of fact. "Where a state court determines factual questions using the same standards the bankruptcy court would use, collateral estoppel should be applied to promote judicial economy by encouraging the parties to present their strongest arguments." *Klingman v. Levinson,* 831 F.2d 1292, 1295 (7th Cir. 1987). Issue preclusion relieves parties of the cost of multiple lawsuits, conserves judicial resources, and helps avoid inconsistent decisions, encouraging reliance on adjudication. *Allen v. McCurry,* 449 U.S. 90, 94 (1980). Federal courts, by giving the same full faith and credit to state court judgments as they are given in the courts of that state, 28 U.S.C. §1738, must look to the preclusion law of the state in which the judgment was rendered in determining whether the doctrine of collateral estoppel is applicable. *In re Catt*, 368 F.3d 789 (7th Cir. 2004).

Under Illinois law, collateral estoppel precludes the relitigation of factual issues when (1) the issue sought to be precluded is identical to the issue decided in the prior action; (2) the party against whom the estoppel is asserted must have been a party or in privity with a party to the prior adjudication; and (3) there must have been a final judgment on the merits in the prior action. *Brokaw v. Weaver*, 305 F.3d 660 (7th Cir. 2002); *DuPage Forklift Service, Inc. v. Material Handling Services, Inc.*, 195 Ill.2d 71 (2001). Application of the doctrine is limited to the factual or legal issues actually litigated and only where the determination of those issues was essential to the final judgment. *Talarico v. Dunlap,* 177 Ill.2d 185, 191 (1997); *Klingman v. Levinson*, 831 F.2d at 1295. Explaining the limitations of the doctrine, the court in *Hexacomb Corp. v. Corrugated Systems, Inc.,* 287 Ill.App.3d 623, 631 (1 Dist. 1997), stated:

> In order for a previous judgment to be conclusive, it must appear clearly and certainly that the identical and precise issue was decided in the previous action. It is absolutely necessary that there shall have been a finding of a specific fact in the former judgment or record that is material and controlling in that case and also material and controlling in the subsequent case. It must also conclusively appear that the matter of fact was so in issue that it was necessarily decided by the court rendering the prior judgment. (citations omitted).

Any uncertainty about the findings of the court that issued the prior judgment precludes application of the doctrine of collateral estoppel. See *Lange v. Coca-Cola Bottling Co. of Chicago, Inc.,* 44 Ill.2d 73, 75 (1969).

The party asserting issue preclusion has the burden of establishing that the doctrine should be applied. *Los Amigos Supermarket, Inc. v. Metropolitan Bank & Trust Co.*, 306

Ill.App.3d 115 (1 Dist. 1999). Since a court may not apply the rule of estoppel based on speculation as to the findings of the prior court, the party asserting the preclusion bears a "heavy burden" to establish "with clarity and certainty what was determined by the prior judgment." *Jones v. City of Alton, Ill.,* 757 F.2d 878, 885 (7th Cir. 1985) (applying Illinois law); *Hexacomb Corp.* 287 Ill.App.3d at 631. As a general rule, the second court must examine the record in the prior proceeding to determine the controlling facts and identify the exact issues litigated in the prior action. *In re Griffieth*, 2004 WL 316493 (Bankr. C.D. Ill.). Where collateral estoppel is sought to be applied in a dischargeability action, the bankruptcy court must consider whether the elements of the cause of action that went to judgment in the state court are identical to those to be applied under §523(a). *In re Scott,* 588 B.R. 122, 132 (Bankr. D. Id. 2018); *In re Barr,* 606 B.R. 210 (Bankr. D. N.J. 2019).

The requirement that the issues of fact must be the same can be a difficult hurdle to clear where the debtor's state of mind is in question. The terms "willful" and "malicious" as used in §523(a)(6), having been precisely defined by the federal courts, require a bankruptcy court to apply those particular legal standards. Other usages of those terms, outside the context of a dischargeability action, may incorporate a different definition and standard that is not "identical" to the bankruptcy usage. See *B & B Hardware, Inc. v. Hargis Industries, Inc.,* 575 U.S. 138, 154 (2015) (issues are not identical if the second action involves application of a different legal standard). Accordingly, the burden borne by the party advancing collateral estoppel includes the need to establish the legal standard used by the first court, not merely that the same words were used. See *In re Busch,* 311 B.R. 657, 666 (Bankr. N.D. N.Y. 2004) (absence of substantive identity of issues was fatal to application of collateral estoppel, notwithstanding that the issues were described using the same term "willful"); *In re Tharp,* 1997 WL 851434, at *8 (Bankr. N.D. Ill.) (identity of the issues for collateral estoppel focuses on the substantive identity between the pertinent issues in the two proceedings, not the similarity of verbiage).

In this Court's view, it is not sufficient that the probate court, in its first order, characterized the Debtor's conduct as "willful" and "malicious." For preclusion to apply here, the Executor must establish that it was actually litigated and necessarily decided by the probate court that the Debtor acted with subjective intent to harm the probate estate and without just

8

cause, the same standards applied under §523(a)(6). See *In re Berge,* 953 F.3d 907, 917 (6th Cir. 2020).

Even where the threshold elements of the doctrine are satisfied, collateral estoppel is discretionary and "must not be applied to preclude parties from presenting their claims or defenses unless it is clear that no unfairness results to the party being estopped." *Talarico v. Dunlap,* 177 Ill.2d at 191-92. Considerations of fairness take on particular significance where, as here, a plaintiff is seeking to preclude a defendant from presenting a defense on the basis that she litigated and lost on the same issue of fact in a different proceeding. See *In re Owens,* 125 Ill.2d 390, 398-99 (1988) (courts must be more cautious in allowing collateral estoppel to be used offensively than in allowing it to be used defensively). In determining whether a party has had a full and fair opportunity to litigate an issue in a prior action, the "practical realities" of that litigation must be examined. *Talarico v. Dunlap,* 177 Ill.2d at 192.

In this Court's view, the Executor's reliance on the doctrine of collateral estoppel is unsupportable. Preliminarily, the Executor ignores the separateness of the two orders issued by the probate court. Under the Probate Act of 1975, like the statutes of other states, the administration of a probate estate consists of a series of various steps or phases which are essentially regarded as separate proceedings. See 755 ILCS 5/1-1 *et. seq.* The order entered January 11, 2019, on the Executor's motion to dismiss the claim filed by the Debtor and for sanctions against her, awarded the Decedent's estate a judgment against the Debtor in the total amount of $2,695, representing costs of $195 and attorney fees of $2,500. A second order, entered April 12, 2019, on the Executor's petition for citation to recover assets, as amended in open court, directed the Debtor to pay the Estate $15,900 within fourteen days, to deliver the title to a vehicle and to turn over all personal property which had belonged to the Debtor. Article XVIII of the Illinois Probate Act governs claims against estates. Article XVI establishes procedures for recovery of property belonging to the estate, providing for the filing of a citation on behalf of the estate, and provides for the adjudication, upon evidence, of all questions of title and rights to personal property in which the Estate has or claims to have an interest. The two probate court orders are substantively and procedurally distinct and unrelated and may not be construed together.

In contending that the probate court decided issues that are identical to elements of a section 523(a)(6) action, the Executor relies on the probate order entered January 11, 2019, on the Executor's Motion to Dismiss Claim and Motion for Sanctions, containing the finding that the tardy filing of her claim more than two years after the Decedent's death, along with her "unbelievable" testimony at a hearing on January 4, 2019, were the latest actions by the Debtor that were "part of a course of conduct which is frivolous, willful, malicious and which has unnecessarily hampered the administration of this Estate." Neither the Debtor's Claim, the Executor's Motion to Dismiss the Claim or his Motion for Sanctions are a part of the record before this Court. No transcript of the January 4th hearing was provided. In addition, although the probate proceeding had been pending more than two years as the probate court noted, the Executor did not provide this Court with a docket of the proceedings. As a result, the record is devoid of evidence of the actions or conduct which formed the basis for the probate court's decision.

The Executor makes no attempt, via evidence or citation to statutory or common law authority, to identify or establish the legal standard applied by the probate court when making the finding of a willful and malicious course of conduct. The Court regards that characterization, lacking any underlying subordinate facts, as one of many possible descriptions of misbehavior that a trial court could use to justify sanctions. There is no basis for this court to determine that the probate court's finding of willful and malicious conduct was a necessary precondition of the sanctions award or that those terms, as used by the probate court, carry the same meaning as in §523(a)(2)(A). The order recites no statute or rule as providing the basis for sanctions. Although Illinois Supreme Court Rule 137 permits the trial court to award sanctions when a pleading has no basis in fact or law, the Rule does not make willful and malicious conduct the standard for such an award. Whether issued under Rule 137 or simply as a matter of the trial court's inherent authority to impose sanctions for litigation misconduct, nothing in the record supports the Executor's supposition that the award required proof of willfulness and maliciousness as elements of the remedy. The probate court also based the sanctions award on findings that the Debtor's actions were "frivolous" and "unnecessarily hampered" the administration of the estate. Where, as here, the probate court's use of the terms "willful" and "malicious" do not refer to elements of a particular cause of action and are not otherwise tethered to an established

10

definition, the Executor is unable to make the threshold showings that those findings were both essential to the sanctions order and were substantively identical to the elements of §523(a)(6).

Neither can it be concluded that the issue of whether the Debtor's misconduct before the probate court rose to the level of willful and malicious, was fully and fairly litigated in the sense that an evidentiary hearing was held upon due notice that that issue would be tried. Nothing in the record indicates that the issues of willful and malicious conduct were "actually litigated" in a way that would meet that requirement under the doctrine of collateral estoppel.

Notwithstanding the shortcomings, for collateral estoppel purposes, of the probate court's first order, the Executor seeks to superimpose the finding of "willful and malicious" conduct upon the second order entered by the court and thus shoehorn the second order within the reach of §523(a)(6). The second order was issued after a hearing upon the Executor's Amended Petition for Citation to Recover Assets, brought under section 16-1 of the Probate Act. Pursuant to that provision, an estate representative may petition the court to order a citation for the appearance of any person whom the petitioner believes "to have concealed, converted or embezzled or to have in his possession or control any personal property, books of account, papers or evidences of debt or title to lands which belonged to a person whose estate is being administered in that court or which belongs to his estate or to his representative." 755 ILCS 5/16-1(a). In his Amended Petition, the Executor asked that the Debtor be ordered to deliver the sum of $9,000, representing the proceeds of a check purportedly written and cashed after the Decedent's death; the rents she had collected from the George Street property; five motor vehicles owned by the Decedent and their titles; and certain other personal property listed by item or category belonging to the Decedent. The Petitioner alleged that the Debtor's actions were "willful and illegal" and requested an award of costs and reasonable attorney fees.

The second order entered by the probate court on April 12, 2019, three months after the first order and issued under a separate and distinct provision of the Probate Act, makes no reference to the first order, contains no findings of fact, casts no aspersions on the Debtor and does not characterize her actions or state of mind in any way. The order states that the Amended Petition was further "amended in open court" but does not describe these amendments, and it indicates that Lucille Jackson appeared *pro se* and that the court heard evidence. Without any stated findings or reasoning, the order simply directs Lucille Jackson to deliver to the Executor

11

the sum of $15,190, one car, the 1956 Buick, and its title, along with "any and all other personal property of the Decedent" in her possession. Absent from the order is any finding that the Debtor "concealed, converted or embezzled" any of the Debtor's property and no award of attorney fees or costs was made.

The Executor's supposition that the two orders are unified and interrelated, or should be construed together, is mistaken.  Even assuming, contrary to this Court's determination, that the probate court's "finding" of willful and malicious conduct should be given a preclusive effect to the first order dismissing the Debtor's claim, it would be improper to extend any such effect to the second order.  It must stand alone. Containing no finding of willful and malicious conduct, the second order provides no basis for application of collateral estoppel.

Neither was sufficient evidence presented at trial to prove that the debts in question were debts "for willful and malicious injury by the Debtor" as those concepts are to be applied under §523(a)(6). Willfulness requires proof of an intent to cause harm to a person or property. Maliciousness requires proof that the debt arose from actions taken in conscious disregard of one's duties or without just cause or excuse. There is simply no evidence in the record before this Court that establishes what statements were made or actions engaged in by the Debtor in the probate proceeding that constitute the wrongful course of conduct referred to by the probate court. At the bankruptcy trial, the Debtor testified that she could not recall anything specific with respect to the hearing in probate court on January 4, 2019, and no follow-up questions were asked of her. No transcript of that hearing or any other probate hearing was offered. There is nothing from which an inference could reasonably be drawn that the Debtor was intentionally misusing the probate litigation in order to injure the probate estate. Such an inference cannot be drawn from the mere fact that she filed a claim against the estate that was eventually disallowed. Without any evidence as to what the Debtor said or did in prosecuting her claim, there is no basis that would support a finding that she acted willfully and maliciously within the purview of §523(a)(6).

**Section 523(a)(2)(A)**

Alternatively, the Executor contends that the obligations resulting from the probate orders are nondischargeable under section 523(a)(2)(A), which excepts from discharge any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent

12

obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. Relying on *McClellan v. Cantrell*, 217 F.3d 890 (7th Cir. 2000), the Executor does not contend that the Debtor made a false representation or created false pretenses but rather that a more generalized fraud occurred. "Actual fraud" includes "anything calculated to deceive, whether it be a single act or combination of circumstances, whether the suppression of truth or the suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or by silence, by word of mouth or by look or gesture." *Goldberg Secs., Inc. v. Scarlata (In re Scarlata),* 979 F.2d 521, 531 (7th Cir. 1992) (internal quotation omitted). In order to establish a claim based on "actual fraud," a creditor must prove that (1) a deception occurred that rises to the level of fraud; (2) the debtor subjectively intended to deceive the creditor at the time the fraudulent conduct occurred; and (3) the debtor's actual fraud created the debt at issue. *In re Abraham,* 582 B.R. 202, 214 (Bankr. N.D. Ill. 2018).

To put the issue in the correct context, it is necessary to note that the determination of dischargeability of a debt involves a two-step process: (1) the establishment of a valid prepetition debt owed by the debtor under applicable non-bankruptcy law and (2) a determination whether the debt is nondischargeable under §523(a) of the Bankruptcy Code. *In re Trovato,* 145 B.R. 575, 579 (Bankr. N.D. Ill. 1991). A prepetition judgment satisfies the first step. The Executor's position is that the two orders entered by the probate court are valid debts established under Illinois law, which the Debtor concedes, and that this Court should now determine those debts to be nondischargeable as a matter of the federal law standards under §523(a)(2)(A) of the Bankruptcy Code. Thus, it is not necessary for this Court to determine that the Debtor committed fraud as a matter of Illinois law. The issue is whether the Debtor's conduct that led to the entry of either or both of the two probate court orders, which created two separate debts, qualifies as fraud under section 523(a)(2)(A). This requires the Executor to present sufficient evidence to carry his burden to prove the underlying conduct of the Debtor, so that the Court may evaluate that conduct and determine whether the probate court judgments are debts for money, property or services obtained by "actual fraud" as a matter of bankruptcy law.

The first order entered by the probate court, ordering the Debtor to reimburse the executor for attorney fees and costs he incurred, does not meet the threshold requirement that the

13

subject debt is "for money, property, services, … to the extent obtained by" actual fraud. The language of §523(a)(2)(A) plainly requires that something of value has been wrongfully obtained by the debtor. *In re Sobol,* 545 B.R. 477, 491-92 (Bankr. M.D. Pa. 2016). Frauds that do not involve the receipt of value by the debtor, even if the creditor suffers a financial harm, are not within the scope of this discharge exception. *Id.* (citing *Cohen v. de la Cruz,* 523 U.S. 213, 218-19); *In re Adesanya,* 613 B.R. 808, 836-37 (Bankr. E.D. Pa. 2020) (sanctions award against debtor who gave false testimony not actionable under fraud exception to discharge); *In re Rountree,* 478 F.3d 215 (4th Cir. 2007). Accordingly, the debt evidenced by the probate court order of January 11, 2019 for reimbursement of attorney fees and costs incurred by the Executor, not involving value received by the Debtor, is not actionable under §523(a)(2)(A).

Turning to the second probate court order, the evidentiary record made at trial before this Court is quite limited. All that is known from the probate court documents admitted into the record in this case – consisting only of the orders entered by the probate court and the Executor's Amended Petition for Citation to Recover Assets - is that the probate court imposed sanctions against the Debtor in dismissing her claim against the estate and subsequently, addressing the separate issue of rights in personal property, directed the Debtor to deliver the sum of $15,190 and one car and its title to the Executor, along with any other property owned by the Decedent. The Illinois statute under which the second order was issued does no more than determine whether property rightly belongs to the estate. See 755 ILCS 5/16-1.  The Executor's position that determinations by the probate court that the Debtor "forged" the $9,000 check and "converted" rents necessarily underlie the second order, giving rise to the doctrine of collateral estoppel and requiring the determination that the Debtor's obligations are nondischargeable under the actual fraud prong of section 523(a)(2)(A), cannot be sustained.  The issue of fraud was not litigated in the state court as the April 12, 2019 order makes no finding of forgery, conversion, fraud or any wrongdoing whatsoever.

With respect to the testimony at the bankruptcy trial, the Executor's assertion that the Debtor admitted at trial that she forged the $9,000 check and converted the rents is a mischaracterization of her testimony.  Everything that is in the record before this Court supports the conclusion that the Executor was named on the South Side Bank checking account as a convenience signatory, with no beneficial interest in the funds, to whom ownership of the

14

account did not pass upon the Decedent's death; instead, it became property of the probate estate. See *In re Estate of Kaplan,* 219 Ill.App.3d 448, 458 (1 Dist. 1991). The fact that the probate court exercised jurisdiction over the account and the issue of the propriety of the $9,000 check compels that conclusion.

      A material fact, probative of the Debtor's state of mind regarding the checks she wrote on the South Side Bank checking account, as alleged by the Executor in the adversary complaint and admitted by the Debtor, the Debtor was authorized to act pursuant to a Power of Attorney as the Decedent's attorney-in-fact, which would have been in effect until the time of his death. Before the Decedent died, the checkbook was in the possession of the Decedent and the Debtor, with the Decedent having the absolute right to expend his funds as he saw fit, subject only to the Power of Attorney's appointment of the Debtor as his attorney-in-fact. It follows that to the extent the checking account funds were used to pay Mr. Polnitz for work he performed at the direction and with the consent of the Decedent and the Debtor, there was nothing wrongful about those expenditures. The $9,000 check payment is challenged by the Executor in this proceeding only because it cleared the South Side account two days after the Decedent died, and because the Debtor is the payee. There is no evidence that the Debtor wrote any checks on the South Side account after the Decedent's death, so the $9,000 check must be viewed as a singular event, and not part of a pattern of, for example, fraudulent embezzlement.

      At the bankruptcy trial, the Debtor testified that she wrote out and signed the $9,000 check in the Decedent's presence and at his direction and that it was for the purpose of paying David Polnitz for remodeling work on the Glendale house. The fact that the Debtor signed the Decedent's name and put her initials next to the signature, rather than signing her own name with the initials "POA," as is more customary for an indorsement by an attorney-in-fact, does not make it a "forgery." Her initials refute any inference of an intent to deceive. Moreover, since South Side Bank paid the check despite the anomalous indorsement, it must have been aware of her status and likely had a copy of the Power of Attorney. The $9,000 check was made out five days before the Decedent died. The fact that it was not deposited and/or paid until after his death is not indicative of a fraudulent intent by the Debtor, in light of the Decedent's directions to her. Her testimony that the funds were used to pay Mr. Polnitz is uncontradicted and unimpeached

15

and is corroborated by Mr. Polnitz's testimony and the invoices for his work that were admitted into evidence.

With respect to the rents collected by the Debtor from Mr. Brown after the Decedent's death, the Debtor testified that she had been collecting the rents during the Decedent's last illness and that she continued to do so as he had directed her to do after his death. The Executor admitted that he was aware of and acquiesced in the Debtor's continued collection of the rents, stating that he decided to resolve the matter in the probate proceedings. The Executor knew the Debtor was collecting the rents and was not deceived in any way. Without a deception there is no fraud. He could have raised the issue in the probate court at any time. If and when he did so is not in the record and there is no evidence that the Debtor ignored a court order to stop collecting the rents.

Based on the testimony of the witnesses at trial, all of whom the Court found to be credible, the Court finds no evidence of fraud or fraudulent intent on the part of the Debtor. There is no evidence that the Debtor acted to deceive the Executor. The Debtor's separate obligations to pay $15,190 to the estate, and to reimburse the Executor for the sum of $2,695, are dischargeable.

Judgment will be entered for the Debtor. This Opinion constitutes this Court's findings of fact and conclusions of law made in accordance with Rule 7052(a)(1) of the Federal Rules of Bankruptcy Procedure. A separate Judgment Order will be entered.

# # #